# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

CHAYA SARA KAUFMANN, derivatively on behalf of CVS HEALTH CORPORATION,

    Plaintiff,

    v.

KAREN S. LYNCH, SHAWN M. GUERTIN, THOMAS F. COWHEY, FERNANDO AGUIRRE, JEFFREY R. BALSER, C. DAVID BROWN, ALECIA A. DECOUDREAUX, NANCY-ANN M. DEPARLE, ROGER N. FARAH, ANNE M. FINUCANE, J. SCOTT KIRBY, MICHAEL F. MAHONEY, JEAN-PIERRE MILLON, MARY L. SCHAPIRO, and EDWARD J. LUDWIG,

    Defendants,

    and

CVS HEALTH CORPORATION,

    Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Chaya Sara Kaufmann ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CVS Health Corporation ("CVS" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Karen S. Lynch ("Lynch"), Shawn M. Guertin ("Guertin"), Thomas F. Cowhey ("Cowhey"), Fernando Aguirre ("Aguirre"), Jeffrey R. Balser ("Balser"), C. David Brown ("Brown"), Alecia A. DeCoudreaux ("DeCoudreaux"), Nancy-Ann M. DeParle ("DeParle"), Roger N. Farah ("Farah"),

Anne M. Finucane ("Finucane"), J. Scott Kirby ("Kirby"), Michael F. Mahoney ("Mahoney"), Jean-Pierre Millon ("Millon"), Mary L. Schapiro ("Schapiro"), and Edward J. Ludwig ("Ludwig") (collectively, the "Individual Defendants," and together with CVS, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of CVS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Lynch, Guertin, and Cowhey for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CVS, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 3, 2023 through April 30, 2024, both dates inclusive (the "Relevant Period").

2.      CVS, together with its subsidiaries, represents itself to be "a leading pharmacy benefits manager with approximately 90 million plan members and expanding specialty pharmacy solutions, and a dedicated senior pharmacy care business serving more than 800,000 patients per

year."[1] The Company has over 9,000 retail locations, 1,000 walk-in medical clinics, and 207 primary care medical clinics. CVS operates primarily through three segments: Health Care Benefits, Health Services, and Pharmacy & Consumer Wellness.

3.    The Health Care Benefits segment was purportedly designed to provide "a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, Prescription Drug Plans ['PDPs'], and Medicaid health care management services."[2] Revenue for this segment consists almost entirely of insurance premiums paid by CVS's customers.

4.    CVS's pricing of its private health insurance plans is determined prior to the start of a plan's policy period, which typically lasts one year. The premiums for the plans are based on CVS's own internal forecasts; this makes CVS's ability to accurately model trends such as medical costs and health care utilization vital to the accuracy of these forecasts. A fixed premium rate is typically determined at the start of the policy period. Where there is an unaccounted-for increase in the cost of health care or other benefits during a policy period, the Company is responsible for the payment of such costs. As such, the profitability of the Health Care Benefits segment is impacted by the accuracy of CVS's cost forecasts.

5.    Unbeknownst to the general public during the Relevant Period, these forecasts proved to be ineffective at accounting for trends in medical health costs and health care utilization. During the Relevant Period, Defendants concealed this reality, instead touting the profitability of CVS's Health Care Benefits segment through Medicare and Commercial membership growth. Through press releases, SEC filings, and investor earning calls during the Relevant Period, the

---

[1] *See* page 9 of 2023 10-K (defined below).
[2] *Id.*

3

Company and the Individual Defendants expressed their expectation that the expansion of the Health Care Benefits segment would continue despite declines due to Medicaid redeterminations.

6.    The truth began to emerge on August 2, 2023, when the Company issued a press release announcing its financial and operational results for the second quarter of the fiscal year ended December 31, 2023 ("2023 Fiscal Year") (the "2Q 2023 Press Release"). The 2Q 2023 Press Release announced, among other things, that the Company was lowering its guidance for diluted earnings-per-share from between $6.90 to $7.12 to between $6.53 to $6.75. In the quarterly report CVS filed on Form 10-Q with the SEC that same day (the "2Q 2023 10-Q"), the Company attributed the decrease to operating income "decreas[ing] $1.4 billion, or 30.7%, in the three months ended June 30, 2023, compared to the prior year *primarily due to declines in the Health Care Benefits segment*."[3]

7.    On this news, the price of the Company's common stock fell $2.04 per share, or approximately 2.7%, from a closing price of $74.36 per share on August 2, 2023, to a closing price of $72.32 per share on August 3, 2023. However, the Individual Defendants continued to obfuscate the truth about the ineffective accounting in forecasting healthcare premiums and the profitability of the Health Care Benefits Segment.

8.    Later, on November 1, 2023, the Company published a press release disclosing its financial and operational results for the quarter ended September 30, 2023, which revealed that CVS was again lowering its diluted EPS guidance range to $6.37 to $6.61 from $6.53 to $6.75. The same day, the Company filed a quarterly report on Form 10-Q with the SEC which stated that, while operating income increased "in the nine months ended September 30, 2023 compared to the prior year [. . . ] [t]hese increases in operating income were partially offset by declines in the Health

_____

[3] Unless otherwise noted, all emphasis is added.

Care Benefits segment."

9.      Months later, on February 7, 2024, the Company published a press release disclosing its financial and operational results for the 2023 Fiscal Year, which revealed that CVS was lowering its diluted EPS guidance range to at least $7.06 from at least $7.26, its adjusted EPS guidance range to at least $8.30 from at least $8.50, and its cash flow from operations guidance to at least $12.0 billion from at least $12.5 billion. The same day, the Company hosted an earnings call wherein Defendant Cowhey stated that "we now expect adjusted operating income for the Healthcare Benefit segment to be at least $5.4 billion, a decrease of $370 million from our prior estimates."

10.     On this news, the price per share of the Company's stock fell $0.96 per share, or 1.27%, to close at $74.36 per share on February 8, 2024.

11.     The truth did not fully emerge until May 1, 2024, when the Company issued a press release announcing its financial and operational results for the first quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year") and revising its guidance for the 2024 Fiscal Year (the "1Q 2024 Press Release"). The 1Q 2024 Press Release revealed that the Company reported only $88.4 billion in revenue for the first quarter, short of the $89 billion expected. Further, the 1Q 2024 Press Release revealed that the higher utilization of the Company's healthcare services (i.e., more insurance dollars spent) impacted its results in addition to Medicare reimbursement rates being cut. These impacts in the Health Care Benefits segment were expected to continue to affect CVS throughout the year. As such, the 1Q 2024 Press Release announced revised guidance for the 2024 Fiscal Year, namely: "[r]evised GAAP diluted EPS guidance to at least $5.64 from at least $7.06"; "[r]evised Adjusted EPS guidance to at least $7.00 from at least $8.30"; and "[r]evised cash flow from operations guidance to at least $10.5 billion from at least

$12.0 billion."

12.    In addition to the 1Q 2024 Press Release, CVS also filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2024 Fiscal Year that same day (the "1Q 2024 10-Q"). The 1Q 2024 10-Q revealed that the Company's operating revenue decrease by $1.2 billion, or 34.1%, in the first quarter "primarily due to increased Medicare utilization, the unfavorable impact of the previously disclosed decline in the Company's 2024 Medicare Advantage star ratings and a year-over-year unfavorable impact from development of prior-years' health care cost estimates in the Health Care Benefits segment."

13.    On this news, the price of the Company's common stock fell $11.40 per share, or approximately 16.8%, from a closing price of $67.71 per share on April 30, 2024, to a closing price of $56.31 per share on May 1, 2024.

14.    During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that:  (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health

Care Benefits segment; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the Company's Long-Term Incentive Plan (the "2017 ICP"); and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

16.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing CVS to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between January 2024 and March 2024, approximately 39,702,374 shares of CVS common stock were repurchased, costing the Company *over $3.0 billion*. As the Company's stock was actually worth only $56.31 per share, the price at which it was trading when markets closed on May 1, 2024, the Company overpaid for repurchases of its own stock *by over $764.4 million* in total.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), and its former EVP and CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of

corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company's directors' receipt of material benefits due to the amendment to the 2017 ICP, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the EVP/CFO's, the former EVP/CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of CVS. Plaintiff currently owns Company stock and first purchased Company stock before the beginning of the Relevant Period, which Plaintiff has continuously owned since then. Plaintiff is a citizen of Texas.

### Nominal Defendant CVS

27.     CVS is a Delaware corporation with its principal executive offices at One CVS Drive, Woonsocket, Rhode Island 02895. CVS's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CVS."

### Defendant Lynch

28.     Defendant Lynch has served as the Company's CEO and as a director since February 2021. Previously, she served as the EVP of CVS Health and President of Aetna from

2015 until taking on the role of CEO in 2021. She also serves as a member of the Executive Committee. According to the proxy statement that the Company filed with the SEC on April 5, 2024 (the "2024 Proxy Statement"), as of March 18, 2024, Defendant Lynch beneficially owned 1,623,815 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Lynch owned approximately $126 million worth of CVS stock as of that date.[5]

29.    For the 2023 Fiscal Year, Defendant Lynch received $21,615,034 in total compensation from the Company. This included $1,500,000 in salary, $12,374,971 in stock awards, $4,124,992 in option awards, $2,992,000 in non-equity incentive plan compensation, and $623,071 in all other compensation.

30.    The 2024 Proxy Statement stated the following about Defendant Lynch:

Ms. Lynch became Chief Executive Officer and President of CVS Health on February 1, 2021. Prior to this appointment, Ms. Lynch served as an Executive Vice President of CVS Health and President of Aetna from November 2018 through January 2021 where she was responsible for delivering consumer-centric, holistic health care to the millions of people Aetna serves. Ms. Lynch also served as President of Aetna Inc. from 2015 until January 2021. She previously served as Executive Vice President of Aetna's Local and Regional Business from 2013 to 2014 and Executive Vice President of Aetna's Specialty Products Business from 2012 to 2013. Before joining Aetna, Ms. Lynch held executive positions at Magellan Health Services, a health care management company, where she served as president, and at Cigna Corporation, a global health insurance company. Ms. Lynch began her career as a certified public accountant at the auditing firm of Ernst & Young LLP.

---

[4] In the section titled "Share Ownership of Directors and Certain Executive Officers," the 2024 Proxy Statement represents that the total "Amount and Nature of Beneficial Ownership" for each individual discussed therein is made up of their Common Stock and their Rights to Acquire Beneficial Ownership of Shares.

[5] Plaintiff's calculations of the worth of each Individual Defendant's CVS stock holdings discussed herein are based on the sum of that Individual Defendant's holdings of Common Stock and Rights to Acquire Beneficial Ownership of Shares (*i.e.*, the amount in the "Total" column under "Amount and Nature of Beneficial Ownership" in the 2024 Proxy Statement), multiplied by $77.57 (*i.e.*, the price per share of CVS's common stock at the close of trading on March 18, 2024).

Ms. Lynch served on the board of directors of U.S. Bancorp, a financial services holding company, from 2015 to 2022. Ms. Lynch also has experience serving on not-for-profit boards and on the boards of trade associations.

Ms. Lynch is a seasoned health care expert who has over three decades of experience in the industry and currently leads more than 300,000 purpose-driven colleagues. Under Ms. Lynch's leadership, CVS Health touches the lives of more than 120 million consumers through its health care benefits and pharmacy benefits management businesses, and presence in over 9,000 community health destinations across the U.S. She is consistently rated as a top innovator and influencer in the health care space and has been recognized for her leadership in health care. Ms. Lynch has been named to Fortune's *Most Powerful Women in Business* list in each of the past eight years, and topped the list in each of the last three years. Ms. Lynch is the right leader to guide CVS Health into its next era of growth as the Company continues its transformation.

\* \* \*

Ms. Lynch has over three decades of experience in the health care industry. Under her leadership, CVS Health touches the lives of more than 120 million consumers each year through its unique combination of assets. Prior to becoming President and Chief Executive Officer, she was EVP and President of Aetna, responsible for driving the strategy to deliver consumer-focused, high-value health care to the millions of people Aetna serves. She joined the Company through the acquisition of Aetna in November 2018.

31.     Upon information and belief, Defendant Lynch is a citizen of Rhode Island.

**Defendant Guertin**

32.     Defendant Guertin served as the Company's EVP and CFO from May 2021 until he went on personal leave in October 2023; Defendant Guertin stepped down from his role as EVP and CFO in January 2024. In May 2024, Defendant Guertin officially left the Company. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Guertin beneficially owned 207,132 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Guertin owned approximately $16.1 million worth of CVS stock as of that date.

33.     For the 2023 Fiscal Year, Defendant Guertin received $12,494,134 in total

compensation from the Company. This included $989,583 in salary, $7,499,980 in stock awards, $2,499,999 in option awards, $1,439,000 in non-equity incentive plan compensation, and $65,572 in all other compensation.

34.    The proxy statement that the Company filed with the SEC on April 7, 2023 (the "2023 Proxy Statement"), stated the following about Defendant Guertin:

> Mr. Guertin joined CVS Health in May 2021. He previously served as Executive Vice President, Chief Financial Officer and Chief Enterprise Risk Officer of Aetna Inc. from January 2014 to May 2019 and as Senior Vice President, Chief Financial Officer and Chief Enterprise Risk Officer from February 2013 to January 2014. Prior to that role, he served as Head of Business Segment Finance at Aetna from April 2011 to February 2013 and held various leadership positions at Coventry Health Care, Inc., including Executive Vice President and Chief Financial Officer from January 2005 to December 2009, Senior Vice President and Chief Actuary from February 2003 to December 2005 and Vice President of Finance from April 1998 to February 2003.

35.    Upon information and belief, Defendant Guertin is a citizen of Connecticut.

**Defendant Cowhey**

36.    Defendant Cowhey joined the Company in February 2022 as its Senior Vice President, Capital Markets and has served as the Company's EVP and CFO since January 2024. Previously, he served as CVS's Interim CFO from October 2023 until his appointment as EVP and CFO in January 2024. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Cowhey beneficially owned 51,740 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Cowhey owned approximately $4 million worth of CVS stock as of that date.

37.    For the 2023 Fiscal Year, Defendant Cowhey received $4,579,937 in total compensation from the Company. This included $771,250 in salary, $2,187,397 in stock awards, $562,490 in option awards, $788,000 in non-equity incentive plan compensation, $2,095 in change in pension value and nonqualified deferred compensation earnings, and $268,705 in all other

compensation.

38.     The 2024 Proxy Statement stated the following about Defendant Cowhey:

Mr. Cowhey was appointed Executive Vice President and CFO in January
2024, following his October 2023 appointment as Interim CFO. Prior to that, he
served as our Senior Vice President, Capital Markets since joining the Company in
February 2022 and in September 2023 his role had expanded to include oversight
of a broader set of corporate finance functions. Prior to joining CVS Health, Mr.
Cowhey served as Executive Vice President and Chief Financial Officer for
Surgery Partners, a health care services company, from April 2018 through
February 2022. Prior to that he held leadership roles at Aetna, Legacy Partners
Group and in the health care and mergers and acquisitions groups at Credit Suisse.

39.     Upon information and belief, Defendant Cowhey is a citizen of Tennessee.

**Defendant Aguirre**

40.     Defendant Aguirre has served as a Company director since November 2018.

Defendant Aguirre also serves as the Chair of the Audit Committee and as a member of the

Management Planning and Development Committee. He also previously served as a member of

the Executive Committee. According to the 2024 Proxy Statement, as of March 18, 2024,

Defendant Aguirre beneficially owned 32,844 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on March 18, 2024 was

$77.57, Defendant Aguirre owned approximately $2.5 million worth of CVS stock as of that date.

41.     For the 2023 Fiscal Year, Defendant Aguirre received $318,167 in total

compensation from the Company. This included $87,932 in fees earned and paid in cash and

$230,235 in stock awards.

42.     The 2024 Proxy Statement stated the following about Defendant Aguirre:

Mr. Aguirre is the former Chairman, President and Chief Executive Officer of
Chiquita Brands International, Inc. ("Chiquita"), a global distributor of consumer
products, having served as Chiquita's President and Chief Executive Officer from
January 2004 to October 2012 and its Chairman from May 2004 to October 2012.
Prior to joining Chiquita, Mr. Aguirre worked for more than 23 years in brand
management, general management and turnarounds at The Procter & Gamble

13

Company ("P&G"), a manufacturer and distributor of consumer products. Mr. Aguirre began his P&G career in 1980, serving in various capacities including President and General Manager of P&G Brazil, President of P&G Mexico, Vice President of P&G's global snacks and U.S. food products, and President of global feminine care. Mr. Aguirre was a member of the board of directors of Aetna from 2011 until the closing of the Aetna Transaction, when he became a director of CVS Health. Mr. Aguirre also serves as a director of Barry Callebaut AG, a manufacturer of high-quality chocolate and cocoa products, and is the chair of its nominating and compensation committee, and as a director of Synchrony Financial, a consumer financial services company. He also serves as chair of Synchrony's nominating and corporate governance committee.

Mr. Aguirre brings to the Board extensive consumer products, global business and executive leadership experience. As a former Chairman and CEO of a large public company that produces and distributes consumer products worldwide, he has significant brand management and international experience that is valuable to the Board's strategic and operational understanding of global markets. Mr. Aguirre's experience and service on other large public company boards, where he has served as chair of various committees, positions him well as the Chair of our Audit Committee and member of the Management Planning and Development Committee.

43.    Upon information and belief, Defendant Aguirre is a citizen of Florida.

**Defendant Balser**

44.    Defendant Balser has served as a Company director since September 2022. He also serves as a member of the Health Services and Technology Committee, the Audit Committee, and the Executive Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Balser beneficially owned 5,093 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Balser owned approximately $395,064 worth of CVS stock as of that date.

45.    For the 2023 Fiscal Year, Defendant Balser received $301,500 in total compensation from the Company. This included $83,778 in fees earned and paid in cash and $217,722 in stock awards.

46.    The 2024 Proxy Statement stated the following about Defendant Balser:

Dr. Balser has served as the chief executive of Vanderbilt University Medical Center ("VUMC") since 2009 and has been President and Chief Executive Officer since 2016, when VUMC became an independent health care company. He has also served as the Dean of the Vanderbilt University School of Medicine since 2008. Dr. Balser is a member of the National Academy of Medicine and serves on its governing council. He previously served on the board of Varian Medical Systems, Inc., an oncology treatment device and software maker that was publicly traded, from October 2018 until Varian was acquired by Siemens Healthineers AG in April 2021.

Dr. Balser's business experience includes large regional quaternary health delivery system leadership, human capital management, senior business management experience including a number of community hospital and medical practice acquisitions, overall risk management expertise through oversight of VUMC's quality, compliance and corporate integrity activities, and financial expertise through management of its financial statements and VUMC's separation from Vanderbilt University. His experience as a physician scientist includes leading NIH-funded research in various areas of pharmacogenomics and spearheading growth in personalized medicine at VUMC from research concepts to bedside care, integrating advances in informatics, discovery science, and precision genomics. Under his leadership, VUMC has become an academic leader in health information technology. His education and experience as an M.D. with a Ph.D. in pharmacology are considered by the Board to be tremendous assets as the Company further expands into health care delivery services. The Board believes that Dr. Balser's experience adds knowledge and leadership depth and that he brings great value as a member of the Health Services and Technology Committee.

47.     Upon information and belief, Defendant Balser is a citizen of Tennessee.

**Defendant Brown**

48.     Defendant Brown has served as a Company director since March 2007. Defendant Brown also serves as the Chair of the Management Planning and Development Committee, and as a member of the Nominating and Corporate Governance Committee. He also previously served as a member of the Executive Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Brown beneficially owned 198,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Brown owned approximately $15.4 million worth of CVS stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Brown received $321,500 in total compensation from the Company. This included $88,750 in fees earned and paid in cash and $232,750 in stock awards.

50.     The 2024 Proxy Statement stated the following about Defendant Brown:

Mr. Brown has been a partner of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"), a national law firm, since the August 2018 merger of Nelson Mullins and the Florida-based Broad and Cassel, of which Mr. Brown was Chairman from March 2000 through the time of the merger. He was also a member of the executive committee of Nelson Mullins until he rotated off the committee in December 2021. He served as the lead director of Rayonier Advanced Materials Inc., a leading specialty cellulose production company, until his retirement from that board in May 2020. Mr. Brown previously served on the board of Caremark Rx, Inc. from March 2001 until the closing of the merger transaction involving CVS Health and Caremark, when he became a director of CVS Health.

Mr. Brown's legal expertise and health care experience are highly valued by the Board, as is his ability to analyze and interpret complex issues and facilitate Board engagement. He has a broad background in large-scale corporate and real estate transactions, both domestically and internationally. Mr. Brown has significant health care experience, including through his oversight of UF Health while serving as Chairman of the Board of Trustees for the University of Florida and as a member of the board of directors and executive committee of Orlando Health, a not-for-profit health care network. The Board believes that Mr. Brown's experience adds knowledge and leadership depth to the Board.

51.     Upon information and belief, Defendant Brown is a citizen of Florida.

**Defendant DeCoudreaux**

52.     Defendant DeCoudreaux has served as a Company director since March 2015. She also serves as a member of the Health Services and Technology Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant DeCoudreaux beneficially owned 32,432 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant DeCoudreaux owned approximately $2.5 million worth of CVS stock as of that date.

53.     For the 2023 Fiscal Year, Defendant DeCoudreaux received $301,500 in total compensation from the Company. This included $83,750 in fees earned and paid in cash and $217,750 in stock awards.

54.     The 2024 Proxy Statement stated the following about Defendant DeCoudreaux:

Ms. DeCoudreaux is President Emerita of the former Mills College, a liberal arts college for women with graduate programs for women and men, which is now known as Mills College at Northeastern University, having served a five-year term as President from July 2011 through June 2016. Previously, Ms. DeCoudreaux served in a number of leadership roles at Eli Lilly and Company, a global pharmaceutical manufacturer ("Eli Lilly"), including as Vice President and Deputy General Counsel, Specialty Legal Team, from 2010-2011, Vice President and General Counsel, Lilly USA, from 2005-2009, and Secretary and Deputy General Counsel of Eli Lilly from 1999-2005. During her 30-year career with Eli Lilly, Ms. DeCoudreaux also previously served as Executive Director of Lilly Research Laboratories, Director of Federal Government Relations, Director of State Government Relations and Director of Community Relations. In addition, Ms. DeCoudreaux has served on a number of charitable, educational, for profit and nonprofit boards, including as both a trustee and board chair at Wellesley College. She currently serves as Lead Independent Trustee and Chair of the Board of Trustees of Parnassus Funds/Parnassus Income Funds, a family of investment funds that integrates environmental, social and governance factors and fundamental investment principles.

Ms. DeCoudreaux has more than 30 years of experience in the pharmaceutical industry, and her experience as an attorney in that field and in the area of corporate governance makes her a great asset to our Board.

55.     Upon information and belief, Defendant DeCoudreaux is a citizen of Massachusetts.

**Defendant DeParle**

56.     Defendant DeParle has served as a Company director since September 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Health Services and Technology Committee. She also previously served as a member of the Executive Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant DeParle beneficially owned 33,035 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant DeParle owned approximately $2.6 million worth of CVS stock as of that date.

57.    For the 2023 Fiscal Year, Defendant DeParle received $321,500 in total compensation from the Company. This included $88,826 in fees earned and paid in cash and $232,674 in stock awards.

58.    The 2024 Proxy Statement stated the following about Defendant DeParle:

Ms. DeParle has been a Managing Partner of Consonance Capital Partners, LLC, a private equity firm focused on investing in small and mid-size health care companies, since March 2020, and was a Partner from August 2013 until March 2020. She also is a Co-founder of the firm. From March 2009 to January 2013, Ms. DeParle served in the White House, first as Counselor to the President and Director of the White House Office of Health Reform, and later as Assistant to the President and Deputy Chief of Staff for Policy. From 1997 to 2000, Ms. DeParle served as the Administrator of the Centers for Medicare & Medicaid Services (then known as the Health Care Financing Administration), and from 1993 to 1997, she served as the Associate Director for Health and Personnel for the White House Office of Management and Budget, or OMB. From 2001 to March 2009, Ms. DeParle served as a Senior Advisor with JPMorgan Partners and as a Managing Director of its successor entity, CCMP Capital, L.L.C., focusing on private equity investments in health care companies. Ms. DeParle is also currently a director of HCA Healthcare, Inc., a health care services company that owns, manages or operates hospitals and other health care facilities. She has extensive experience serving on the boards of both public and privately held companies, particularly in the health care space.

Ms. DeParle has more than 25 years of experience in the health care arena. She is widely considered to be one of the nation's leading experts in health care policy, management and financing, which makes her an excellent fit for our Board. Her background in public policy and government affairs, legal and regulatory compliance, and corporate governance and sustainability makes her an excellent Chair of our Nominating and Corporate Governance Committee.

59.    Upon information and belief, Defendant DeParle is a citizen of Maryland.

**Defendant Farah**

60.    Defendant Farah has served as a Company director since November 2018 and has served as the Independent Chair of the Board since May 2022. He also serves as the Chair of the Executive Committee and as a member of the Management Planning and Development Committee

and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Farah beneficially owned 34,030 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Farah owned approximately $2.6 million worth of CVS stock as of that date.

61.    For the 2023 Fiscal Year, Defendant Farah received $576,500 in total compensation from the Company. This included $152,500 in cash fees elected to be paid in stock and $424,000 in stock awards.

62.    The 2024 Proxy Statement stated the following about Defendant Farah:

Mr. Farah has been Independent Chair of the Board of CVS Health since May 2022. He is the former Chairman of the Board and a director of Tiffany & Co., a retailer of jewelry and specialty products, having served in that role from October 2017 to January 2021. He served as Executive Director of Tory Burch LLC, a retailer of lifestyle products, from March 2017 to September 2017, having previously served as Co-Chief Executive Officer and director from September 2014 to February 2017. He is former Executive Vice Chairman of Ralph Lauren Corporation, a retailer of lifestyle products, having served in that position from November 2013 to May 2014, and previously served as President and Chief Operating Officer ("COO") from April 2000 to October 2013, and a director from April 2000 to August 2014. During his 40-plus year career in retailing, Mr. Farah also held director and/or executive positions with Venator Group, Inc. (now Foot Locker, Inc.), R.H. Macy & Co., Inc., Federated Merchandising Services, the central buying and product development arm of Federated Department Stores, Inc., Rich's/Goldsmith's Department Stores, and Saks Fifth Avenue, Inc. Mr. Farah was a member of the board of directors of Aetna from 2007 until the closing of the Aetna Transaction, when he became a director of CVS Health. He was a director of Metro Bank PLC, a financial services company, until his retirement from that board in March 2020. He currently serves as a director of The Progressive Corporation, an auto insurance company.

Mr. Farah brings extensive business and leadership experience to our Board. He has strong marketing, brand management and consumer insights from his over 40 years of experience in the retail industry. His former positions as Executive Vice Chairman, President and COO of Ralph Lauren and Executive Director and Co-CEO of Tory Burch give Mr. Farah important perspectives on the complex financial and operational issues facing the Company. The Board believes that his experience

as a board chair and executive leading consumer-facing companies makes him very well suited to serve as Independent Chair of our Board.

63.    Upon information and belief, Defendant Farah is a citizen of New York.

**Defendant Finucane**

64.    Defendant Finucane has served as a Company director since January 2011. She also serves as a member of the Audit Committee and the Management Planning and Development Committee. She also previously served as a member of the Executive Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Finucane beneficially owned 39,905 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Finucane owned approximately $3.1 million worth of CVS stock as of that date.

65.    For the 2023 Fiscal Year, Defendant Finucane received $321,500 in total compensation from the Company. This included $88,826 in fees earned and paid in cash and $232,674 in stock awards.

66.    The 2024 Proxy Statement stated the following about Defendant Finucane:

Ms. Finucane has been a Senior Advisor of the TPG Climate Rise Fund ("TPG"), an investment fund focused on various climate sub-sectors, since September 2022 and the Chair of the Board of Rubicon Carbon, a carbon credit firm and a TPG portfolio company, since November 2022. Previously, Ms. Finucane served as Chairman of the Board of Bank of America Europe from July 2018 through December 2022. Ms. Finucane served as a Vice Chairman of Bank of America Corporation, an international financial services company, from July 2015 until her retirement in December 2021. From 2006 through July 2015, Ms. Finucane served as Global Chief Strategy and Marketing Officer for Bank of America and served as Northeast Market President from 2004 through July 2015. As a member of the executive management team, Ms. Finucane was responsible for the strategic positioning of Bank of America and led the company's environmental, social and governance, sustainable finance, capital deployment and global public policy efforts. She established and co-chaired the company's Sustainable Finance Committee, which included a $1 trillion environmental business initiative, deploying capital to help accelerate the transition to a low-carbon, sustainable economy, and was chair of Bank of America's Environmental, Social and

Governance Committee. She currently serves as a director of Williams Sonoma, Inc., a retailer of kitchen and home products.

Ms. Finucane's experience in the financial services industry, consumer policy, strategy, marketing, corporate social responsibility, global public policy and government affairs provides our Board with valuable insight in those key areas. Her distinguished career in banking also makes her a valued member of the Audit and Management Planning and Development Committees.

67.     Upon information and belief, Defendant Finucane is a citizen of Massachusetts.

**Defendant Kirby**

68.     Defendant Kirby has served as a Company director since October 2023. He also serves as a member of the Health Services and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Kirby beneficially owned 2,721 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Kirby owned approximately $211,068 worth of CVS stock as of that date.

69.     For the 2023 Fiscal Year, Defendant Kirby received $195,417 in total compensation from the Company. This included $7,108 in fees earned and paid in cash, $41,875 in cash fees elected to be paid in stock, and $146,434 in stock awards.

70.     The 2024 Proxy Statement stated the following about Defendant Kirby:

Mr. Kirby has been the Chief Executive Officer and a member of the Board of Directors of United Airlines Holdings, Inc. ("United Airlines"), an international air carrier, since May 2020. Mr. Kirby also serves on the Executive Committee and the Finance Committee of the United Airlines Board of Directors. From August 2016 until May 2020, Mr. Kirby was President of United Airlines and was responsible for its operations, marketing, sales, alliances, network planning and revenue management. Prior to joining United Airlines, he was President of American Airlines from December 2013 until August 2016 and was President of US Airways from September 2006 until December 2013, when US Airways merged with American Airlines. He started his career at the Pentagon and in the technology sector. Mr. Kirby is a member of the Board of Directors of SONIFI Solutions, a privately held manufacturer of integrated technology and service platforms. He also currently serves as the Chairman of the Star Alliance Chief Executive Board, a

global alliance consisting of 26 member airlines, and is a member of the Board of Governors of the International Air Transport Association, a trade association comprised of 240 of the world's airlines. Mr. Kirby is also a member of the Board of Directors of the U.S. Air Force Academy Foundation.

Mr. Kirby is a well-known airline industry veteran, with a broad and accomplished three-decade-long career in significant leadership roles. Mr. Kirby brings valuable expertise to the Board from his experience with marketing, sales, alliances and network planning at United Airlines, as well as his education and background in technology. As CEO of a large public company who is responsible for its business and ongoing operations, he has experience and understanding of how to implement strategic priorities. These skills make him well qualified to serve as a member of the Health Services and Technology Committee.

71.    Upon information and belief, Defendant Kirby is a citizen of Illinois.

**Defendant Mahoney**

72.     Defendant Mahoney has served as a Company director since November 2023. He also serves as a member of Management Planning and Development Committee and the Executive Committee.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Mahoney beneficially owned 2,202 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Mahoney owned approximately $170,809 worth of CVS stock as of that date.

73.    For the 2023 Fiscal Year, Defendant Mahoney received $167,500 in total compensation from the Company. This included $41,891 in fees earned and paid in cash and $125,609 in stock awards.

74.    The 2024 Proxy Statement stated the following about Defendant Mahoney:

Mr. Mahoney has been the President of Boston Scientific Corporation ("Boston Scientific"), a global developer, manufacturer and marketer of medical devices, since October 2011, and has been Chief Executive Officer and a member of the Board of Directors of Boston Scientific since November 2012. He became Chairman of the Board of Directors of Boston Scientific in May 2016. Prior to joining Boston Scientific, Mr. Mahoney served as Worldwide Company Group Chairman of Johnson & Johnson's DePuy franchise, an orthopedics and neurosciences business, from April 2007 through January 2011. From January 2001

through March 2007, he served as President and Chief Executive Officer of Global Healthcare Exchange, a leading medical supply chain solutions company. Mr. Mahoney began his career at General Electric Medical Systems, where he spent 12 years, culminating in the role of General Manager of the Healthcare Information Technology business. From October 2015 until September 2023, Mr. Mahoney served as a member of the Board of Directors of Baxter International Inc.

Mr. Mahoney has extensive experience leading global, medical products companies, including most recently as Chairman, President and Chief Executive Officer of Boston Scientific Corporation. His management experience includes leading complex organizations in medical device and other healthcare-related businesses, expertise in building strong leadership teams, developing international markets, and a proven ability to execute successful business strategies and drive operational excellence. Mr. Mahoney also has significant knowledge of the global medical products business and extensive experience leading and operating within global, multi-faceted medical products companies as a result of his roles at Boston Scientific and Johnson & Johnson.

75.    Upon information and belief, Defendant Mahoney is a citizen of Massachusetts.

**Defendant Millon**

76.    Defendant Millon has served as a Company director since March 2007. He also serves as the Chair of the Health Services and Technology Committee and as a member of the Audit Committee.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Millon beneficially owned 107,703 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Millon owned approximately $8.4 million worth of CVS stock as of that date.

77.    For the 2023 Fiscal Year, Defendant Millon received $321,500 in total compensation from the Company. This included $88,826 in fees earned and paid in cash and $232,674 in stock awards.

78.    The 2024 Proxy Statement stated the following about Defendant Millon:

Mr. Millon is the former President and Chief Executive Officer of PCS Health Systems, Inc. ("PCS"), a pharmacy benefit management company. Mr. Millon joined PCS in 1995, where he served as President and Chief Executive Officer from June 1996 until his retirement in September 2000. Prior to that, Mr. Millon served

as an executive of and held several global leadership positions with Eli Lilly and Company, a global pharmaceutical manufacturer. Mr. Millon previously served on the board of Caremark from March 2004, upon Caremark's acquisition of AdvancePCS, and as a director of AdvancePCS (which resulted from the merger of PCS and Advance Paradigm, Inc.) beginning in October 2000. He became a director of CVS Health upon the closing of the merger transaction involving CVS Health and Caremark. Mr. Millon has over ten years of financial management experience and 15 years of general functional management experience, including strategic planning experience specific to pharmacy benefit management companies as the former head of PCS. He also has extensive venture capital and public and private company board experience.

Mr. Millon's extensive background and experience in the pharmacy benefit management, pharmaceutical and life sciences businesses, combined with his financial expertise, provide our Board with additional perspective across the enterprise, and make him well qualified to serve as the Chair of our Health Services and Technology Committee.

79.    Upon information and belief, Defendant Millon is a citizen of Arizona.

**Defendant Schapiro**

80.    Defendant Schapiro has served as a Company director since May 2017. She also serves as a member of the Audit Committee and the Health Services and Technology Committee. According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Schapiro beneficially owned 29,738 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Schapiro owned approximately $2.3 million worth of CVS stock as of that date.

81.    For the 2023 Fiscal Year, Defendant Schapiro received $301,500 in total compensation from the Company. This included $83,750 in fees earned and paid in cash and $217,750 in stock awards.

82.    The 2024 Proxy Statement stated the following about Defendant Schapiro:

Since October 2018, Ms. Schapiro has been Vice Chair for Global Public Policy and Special Advisor to the Founder and Chairman of Bloomberg L.P., a privately held financial, software, data and media company. She was Vice Chair of the Board of the Value Reporting Foundation, formerly the Sustainability Accounting

Standards Board until the Value Reporting Foundation was absorbed into the International Financial Reporting Standards Foundation in 2022. From January 2014 through December 2018, Ms. Schapiro served as Vice Chair of Promontory Advisory Board, part of Promontory Financial Group, a leading strategy, risk management and regulatory compliance firm. From January 2009 through December 2012, Ms. Schapiro was Chairman of the U.S. Securities and Exchange Commission, becoming the first woman to serve as that agency's Chairman. Ms. Schapiro was Chairman and CEO of the Financial Industry Regulatory Authority ("FINRA") from 2006 through 2008, and held a number of key executive positions at FINRA and its predecessor from 1996 through 2006. She also served as Chairman of the U.S. Commodity Futures Trading Commission ("CFTC") from 1994 to 1996. Ms. Schapiro is currently a director of Morgan Stanley, a global financial services company.

Ms. Schapiro's experience in leading the SEC, FINRA and the CFTC makes her extremely well qualified to serve on our Board. Ms. Schapiro's leadership of the SEC during the turbulent period that followed the 2008 financial crisis, one of the busiest rulemaking periods in the agency's history, demonstrates her ability to navigate through a difficult and complex regulatory and political environment. Our Board believes that her skills fill important needs in the areas of legal and regulatory compliance, sustainability and climate risk, finance, risk management and public policy and government affairs.

83.     Upon information and belief, Defendant Schapiro is a citizen of Washington, D.C.

**Defendant Ludwig**

84.     Defendant Ludwig served as a Company director from November 2018 until May 2024. In that time, he served as a member of the Audit Committee and as a member of the Investment and Finance Committee.  According to the 2024 Proxy Statement, as of March 18, 2024, Defendant Ludwig beneficially owned 46,362 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2024 was $77.57, Defendant Ludwig owned approximately $3.6 million worth of CVS stock as of that date.

85.     For the 2023 Fiscal Year, Defendant Ludwig received $314,000 in total compensation from the Company. This included $3,125 in fees earned and paid in cash, $83,750 in cash fees elected to be paid in stock, and $227,125 in stock awards.

86.    The 2023 Proxy Statement stated the following about Defendant Ludwig:

Mr. Ludwig is the former Chairman of the Board of Directors of Becton, Dickinson and Company ("BD"), a global medical technology company, having served in that position from February 2002 through June 2012. He also served as Chief Executive Officer of BD from January 2000 to September 2011, President of BD from May 1999 to December 2008 and Chief Financial Officer of BD from January 1995 to May 1999. Mr. Ludwig joined BD as a Senior Financial Analyst in 1979. Prior to joining BD, Mr. Ludwig was a senior auditor with Coopers and Lybrand (now PricewaterhouseCoopers), where he earned his status as a certified public accountant ("CPA"). Mr. Ludwig also served as a director of Xylem, Inc., a water technology company, from 2011 to 2017, and Chairman of Advanced Medical Technology Association, or AdvaMed, a medical device trade association, from 2006 to 2008. Mr. Ludwig was lead director of the Aetna board of directors from 2012 until the closing of the Aetna Transaction, when he became a director of CVS Health. He currently serves as the lead independent director of Boston Scientific Corporation, a global manufacturer of medical devices.

Mr. Ludwig's more than 30 years of experience in the field of medical technology give him a unique perspective on the Company's strategy. As the former Chairman and CEO of BD, Mr. Ludwig brings a thorough appreciation of the strategic and operational issues facing a large public company in the health care industry. As a former CFO and a CPA, Mr. Ludwig offers our Board a deep understanding of financial, accounting and audit-related issues. Mr. Ludwig's experience positions him well to serve as Chair of our Audit Committee.

87.    Upon information and belief, Defendant Ludwig is a citizen of Massachusetts.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

88.    By reason of their positions as officers, directors, and/or fiduciaries of CVS and because of their ability to control the business and corporate affairs of CVS, the Individual Defendants owed CVS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CVS in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CVS and its shareholders so as to benefit all shareholders equally.

89.    Each director and officer of the Company owes to CVS and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

90.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CVS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

91.     To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

92.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CVS, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of CVS's Board at all relevant times.

93.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

94.    To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CVS were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Rhode Island, and the United States, and pursuant to CVS's own Code of Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how CVS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of CVS and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said

reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CVS's operations would comply with all applicable laws and CVS's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

95.    Each of the Individual Defendants further owed to CVS and the shareholders the duty of loyalty requiring that each favor CVS's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

96.    At all times relevant hereto, the Individual Defendants were the agents of each other and of CVS and were at all times acting within the course and scope of such agency.

97.    Because of their advisory, executive, managerial, directorial, and controlling positions with CVS, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

98.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CVS.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

99.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

100.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

101.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CVS was a direct,

necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

102.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

103.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CVS, and was at all times acting within the course and scope of such agency.

## CVS'S CODE OF CONDUCT

### Code of Conduct

104.    CVS's Code of Conduct "applies to everyone in the Company, including the Board of Directors and all colleagues." Additionally, the Code of Conduct "is intended to help resolve ethics and compliance issues by providing the information, tools and resources necessary to make good decisions."

105.    Under the heading "Financial integrity," the Code of Conduct states the following, in relevant part:

> The Sarbanes-Oxley Act of 2002 (SOX) requires certain Company leaders to certify to the truth and accuracy of Company financial statements. SOX also mandates that we maintain appropriate financial controls, report significant fraud and keep detailed and accurate records of all our business operations. We will maintain books, records and accounts that accurately reflect the business transactions and assets of CVS Health. If you have a role in public financial communications, make sure disclosures are full, fair, accurate, timely and understandable.

106.    Under the heading "Confidential and proprietary information," the Code of Conduct states the following, in relevant part:

> Confidential and proprietary information such as trade secrets (which may include certain Company policies and/or procedures), technological advances, customer lists, knowledge of acquisitions or divestitures and financial data are some of the Company's most valuable business assets. This includes information that might be of use to competitors or harmful to the Company or those we serve if disclosed to others. To determine whether or not information is proprietary, consider whether information that is handled or shared on the job might give our competitors an unfair advantage if disclosed to them.

107.    Under the heading "Conflicts of interest," the Code of Conduct states the following:

> A "conflict of interest" may arise when personal interests or activities appear to improperly influence our ability to act in the best interests of the Company. Situations involving a conflict of interest may not always be obvious or easy to resolve.

108.    Under the heading "Disclosure of non-public material information," the Code of Conduct states the following:

> Colleagues and members of the Board of Directors are not permitted to make any disclosure of material, non-public information about the Company to any person or entity outside the Company unless the disclosure complies with the CVS Health Regulation FD Disclosure Policy, which is posted on the Company's intranet sites. If a colleague or member of the Board of Directors of CVS Health believes that a disclosure of material nonpublic information about the Company has occurred, they must immediately notify the General Counsel.

109.    Under the heading "Requests for information from the investment community," the Code of Conduct states the following:

> Colleagues and members of the Board of Directors are not permitted to speak with members of the investment community, including "brokers" or any persons attempting to arrange consultations, regarding any information about the Company unless it has been explicitly authorized in advance by our Investor Relations Department. This prohibition includes the sharing of information about any issues relating to our Company, including our policies, procedures, operations, customer service or client service issues or positions/opinions on any issues concerning our business.

110.    Under the heading "Records retention and management," the Code of Conduct states the following:

> CVS Health works to ensure we handle and maintain all Company records in accordance with our Corporate Records Management Program where applicable, and provides colleagues, contingent workers and suppliers with direction and support in properly managing our records throughout their life cycle. Records used by professionals, such as pharmacists and nurses, must follow all regulatory and accreditation standards and requirements. We never destroy records subject to audit, pending investigation or pending litigation until the audit, investigation or litigation is completed, even if they have reached the end of the required retention period. We must always manage records according to our Corporate Records Management Program.

111.    Under the heading "Leadership responsibilities," the Code of Conduct states the following:

> While setting the tone at the top, CVS Health leadership must "walk the talk" and demonstrate the Company's Heart At Work Behaviors™ in all of their dealings on its behalf. CVS Health leaders are responsible for making strategic business decisions that align with our ethical standards and with this Code. CVS Health leaders, including Managers and Supervisors, must also be knowledgeable about the content and operation of the Compliance and Integrity Program. The leadership team plays an important role in building integrity, respect, credibility and long-term sustainability for the Company. Because leadership sets an example for all colleagues, they must:
>
> - Maintain a positive, ethical work environment;
> - Make certain that colleagues understand what is expected of them both professionally and ethically;
> - Maintain an open-door policy on a routine basis for colleagues to ask questions and raise concerns;
> - Address issues raised by colleagues by listening and taking action, when appropriate;
> - Ensure colleagues complete all training in a timely manner;
> - Address all reports of misconduct and never ignore misconduct or retaliation;
> - Reinforce this Code with colleagues;
> - Immediately report any incidents of workplace harassment or retaliation;
> - Communicate all policies and procedures;
> - Be fair and objective; and
> - Be a positive role model.

*Corporate Governance Guidelines*

112.    CVS represents that its Corporate Governance Guidelines were adopted "to promote a high level of performance from the Board and management, to promote the interests of stockholders and to further the Company's commitment to best practices in corporate governance."

113.    Under the heading "Director Responsibilities," the Corporate Governance Guidelines state:

> The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company.  In fulfilling this role, each director must act in what he or she reasonably believes to be in the best interests of the Company and must exercise his or her business judgment.

114.    Under a subheading in the same section titled "Company Performance and Corporate Strategy," the Corporate Governance Guidelines state:

> The Board reviews the Company's financial performance on a regular basis at Board meetings and through periodic updates, with a particular focus on peer and competitive comparisons.  These reviews include the views of management as well as those of investors and securities analysts.

> The Board also periodically reviews the Company's long-term strategy, and assesses its strategic, competitive and financial performance, on both an absolute basis and in relation to the performance, practices and policies of its peers and competitors.

115.    Under a section titled "Board Committees," the Corporate Governance Guidelines describe the role of the Audit Committee as:

> the Audit Committee shall generally be responsible for overseeing the integrity of the Company's financial statements, its independent auditor, its internal audit function, compliance by the Company with legal and regulatory requirements and overseeing the Company's Code of Conduct.

116.    In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public

and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## CVS'S AUDIT COMMITTEE CHARTER

117.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Audit Committee (the "Committee") was created by the Board of Directors (the "Board") to:
>
> - assist the Board in its oversight of:
>
>   o the integrity of the financial statements of the Company;
>   o the qualifications, independence, performance and engagement of the Company's independent registered public accounting firm (the "independent auditor");
>   o the performance of the Company's internal audit function;
>   o the policy standards and guidelines for risk assessment and risk management;
>   o the Company's compliance program, including compliance with the Company's Code of Conduct; and
>   o compliance by the Company with legal and regulatory requirements; and
>
> - prepare the Audit Committee Report to be included in the Company's annual proxy statement.

118.    The Audit Committee Charter, under the heading "Responsibilities," within the subsection titled "*General*," states that, "[t]he Committee will maintain open lines of

communication with the Company's Chief Financial Officer (the "CFO"), CAE, CCO, and with the Company's independent auditors, each of whom will have free and direct access to the Committee.  The CCO is authorized to communicate promptly and personally to the Committee on all matters that he or she deems appropriate."

119.    Under the same heading, in the subsection titled "*Independent Auditor*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services for the Company (subject, if applicable, to shareholder ratification).  Each such accounting firm shall report directly to the Committee.

- The Committee shall pre-approve the audit services and non-audit services to be provided by the Company's independent auditor pursuant to pre-approval policies and procedures established by the Committee.  The pre-approval policies and procedures shall be periodically reviewed by the Committee.  The Committee may delegate its authority to pre-approve services to one or more Committee members, provided that such designees present any such approvals to the full Committee at the next Committee meeting.

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the scope and staffing of the independent auditor's annual audit plan(s), with emphasis on accounting and financial areas where the Committee, management, or the accountants believe special attention should be directed, and discuss any significant findings from the audit, including any problems or difficulties encountered.

- The Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditor to the full Board on at least an annual basis.  As part of such evaluation, at least annually, the Committee shall:

  o obtain and review a report or reports from the Company's independent auditor:

    ▪ describing the independent auditor's internal quality-control procedures;

36

- describing any material issues raised by (i) the most recent internal quality-control review, or peer review, of the independent auditor, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the independent auditor, and any steps taken to deal with any such issues;

- describing all relationships between the independent auditor and the Company consistent with the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") regarding the independent auditor's communications with the Committee concerning independence; and

- assuring that Section 10A of the Securities Exchange Act of 1934, as amended, has not been implicated;

  o consider whether the provision of non-audit services is compatible with maintaining auditor independence;

  o confirm, and evaluate the rotation of, the audit engagement team partners, review and evaluate the lead partner and consider whether rotation should occur more frequently, so as to assure continuing auditor independence;

  o consider whether the independent auditor should be rotated, so as to assure continuing auditor independence; and

  o obtain the opinion of management and the internal auditors of the independent auditor's performance.

- The Committee shall establish and periodically review the policies for the Company's hiring of current or former employees of the independent auditor.

120.    Under the same heading, in the subsection titled "*Internal Auditors*," the Audit

Committee Charter states that the responsibilities of the Audit Committee are as follows:

- At least annually, the Committee shall evaluate the performance, responsibilities, budget and staffing of the Company's internal audit function and review the internal audit plan. Such evaluation shall include a review of the responsibilities, budget and staffing of the Company's internal audit function with the independent auditor.

- At least annually, the Committee shall review the annual internal audit plan with the senior officer or officers responsible for the internal audit function of the Company.  The review shall focus on the scope and effectiveness of internal audit activities and the department's capability to fulfill its objectives.

- At least annually, the Committee shall review significant findings by the internal audit staff and management's responses to such findings and instances of remedial action not being taken by management within appropriate timeframes in response to any such findings, if any.

- At least annually, the Committee shall review the appointment, performance, reassignment or dismissal, and compensation of the CAE, who shall report directly to the Committee and administratively to the CFO of the Company.

121.   Under the same heading, in the subsection titled "*Financial Statements and Disclosure Matters; Capital Allocation*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

- The Committee shall meet to review and discuss with management, the internal auditors and the independent auditor, in separate meetings if the Committee deems it appropriate:

  o the annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K;

  o the quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

  o analyses or other written communications prepared by management and/or the independent auditor setting forth significant judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and estimates made by management having a material impact on the financial statements;

  o the critical accounting policies and practices of the Company;

- o  critical audit matters disclosed in the independent auditor's reports;

- o  off-balance sheet transactions and structures;

- o  the Company's regulated capital investment portfolio; and

- o  the effect of regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings) and any significant accounting, reporting, regulatory and other developments affecting the Company's annual and quarterly financial statements, related footnotes and related disclosures.

- The Committee shall review, in conjunction with management, the Company's earnings press releases and to the type of financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

- The Committee shall review, in conjunction with management, the financial and other metrics presented in the Company's environmental, social and governance ("ESG") disclosures included as part of the Company's reports to be filed with the SEC, along with the assurance processes and the internal and disclosure controls and procedures for such ESG disclosures.

- The Committee shall, in conjunction with the Chief Executive Officer (the "CEO") and CFO of the Company, at least annually, review and approve the Company's disclosure controls and procedures and also review the effectiveness of the Company's internal controls over financial reporting. The review of internal controls over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to affect the Company's ability to record, process, summarize and report financial information, and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

- The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the independent auditor pursuant to established auditing standards.

- The Committee shall establish and periodically review the procedures for:

- o  the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, and

- o  the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters.

- The Committee shall review any complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures.

- The Committee shall prepare the Audit Committee Report that the SEC rules require to be included in the Company's annual proxy statement.

122.    Under the same heading, in the subsection titled "*Risk Assessment, Risk Management and Compliance Matters*," the Audit Committee Charter states that the responsibilities of the Committee as follows:

- The Committee shall review, in conjunction with management, the independent auditor and the internal audit department, the Company's policies and practices and its implementation and effectiveness with respect to risk assessment and risk management of the Company's major risks, and the steps that have been taken to monitor, control and report such exposures.

- The Committee shall periodically review and approve and shall oversee compliance with the Company's Code of Conduct.  The Committee shall also review and consider any requests for waivers of the Company's Code of Conduct for the Company's directors, executive officers and other senior financial officers, and shall make a recommendation to the Board with respect to such request for a waiver.

- The Committee shall periodically review the Company's information governance framework, including the Company's privacy program and the cyber security aspects of its information security program.The Committee shall review significant cases of employee conflict of interest, misconduct, or fraud.

- As part of its oversight of the Company's compliance program, the Committee shall review the Company's compliance with laws and regulations, including major legal and regulatory matters, such as federal health care program requirements, consent decrees, corporate integrity agreements or similar obligations.  In that regard, the Committee shall review and discuss, in conjunction with management, the implementation

and effectiveness of CVS Health's compliance program, including the performance of the CCO. The Committee shall also review any litigation or investigations that may have a material impact on the Company's financial statements or accounting policies. The Committee shall meet with the CCO no less than four (4) times per year, and shall meet and discuss legal and regulatory matters with management and others as appropriate, including the General Counsel.

123.    Under the same heading, in the subsection titled "*Reporting to the Board*," the Audit Committee Charter states that the responsibilities of the Committee as follows:

- The Committee shall report to the Board periodically and at least annually. These reports shall include a review of any recommendations or issues that arise with respect to the quality or integrity of the Company's financial statements, compliance with the Company's Code of Conduct, the Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the performance of the internal audit function and any other matters that the Committee deems appropriate or is requested to be included by the Board.

- At least annually, the Committee shall evaluate its own performance and the Chair of this Committee shall report to the Board on such evaluation.

- The Committee shall periodically review and assess the adequacy of this charter and recommend any proposed changes to the Board for approval.

124.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

125.    CVS and its subsidiaries comprise one of the leading health solutions companies in the United States. The Company works to connect its over 1 million annual patients to care that works regardless of where the patients are located. CVS achieves this through its over 9,000 retail locations, 1,000 walk-in medical clinics, and 207 primary care medical clinics.

126.    CVS mainly operates through three segments: the Health Care Benefits segment; the Health Services segment; and the Pharmacy and Consumer Wellness segment. The purpose of the Health Care Benefits segment is purportedly to offer consumers "a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, PDPs, and Medicaid health care management services." The revenue for the Health Care Benefits segment almost exclusively consists of insurance premiums.

127.    In pricing its private health insurance plans, CVS uses a forecast to determine the price before the start of a plan's policy period. Policies are typically a year in length, meaning that CVS updates the costs of its plans annually. The forecasts consider historical data as well as profitability. As such, CVS must accurately predict trends in its model such as medical costs and health care utilization numbers. In the event there are unaccounted for increases in the cost of health care or other benefits in a given policy period, CVS will usually be responsible for covering the deficit. Because of this, the accuracy of these forecasts heavily impacts the profitability of the Health Care Benefits segment.

### False and Misleading Statements

*May 3, 2023 Press Release*

128.    On May 3, 2023, the Company issued a press release announcing its financial results for the first quarter of the 2023 Fiscal Year (the "1Q 2023 Press Release"). The 1Q 2023 Press Release revealed, *inter alia*:

> We delivered another strong quarter while executing on the strategy we outlined in December 2021, leading to the close of the Signify Health acquisition followed quickly by Oak Street Health. ***These additions are core to our strategy and will help unlock future growth as we push further into value-based care***, which prioritizes keeping people healthy.

129.    Further, the 1Q 2023 Press Release announced guidance for the remainder of the 2024 Fiscal Year. In particular, the 1Q 2023 Press Release announced "[r]evised GAAP diluted EPS guidance range to $6.90 to $7.12 from $7.73 to $7.93" and "[r]evised Adjusted EPS guidance range to $8.50 to $8.70 from $8.70 to $8.90."

*May 3, 2023 10-Q*

130.    Also on May 3, 2023, the Company filed with the SEC on Form 10-Q its quarterly financial and operational results for the period ended March 31, 2023 (the "1Q 2023 10-Q"). The 1Q 2023 10-Q was signed by Defendants Lynch and Guertin and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lynch and Guertin attesting to the accuracy of the 1Q 2023 10-Q and that "the information contained in the [1Q 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

131.    The 1Q 2023 10-Q expressed optimism when providing an overview of CVS, stating:

> CVS . . . is a leading diversified health solutions company reshaping health care to help make healthier happen for more Americans. In an increasingly connected and digital world, CVS Health is meeting people wherever they are and changing health care to meet their needs. The Company has more than 9,000 retail locations, more

than 1,100 walk-in medical clinics, a leading pharmacy benefits manager with over 110 million plan members with expanding specialty pharmacy solutions and a dedicated senior pharmacy care business serving more than one million patients per year. The Company also serves an estimated 37 million people through traditional, voluntary and consumer-directed health insurance products and related services, including expanding Medicare Advantage offerings and a leading standalone Medicare Part D [PDP]. The Company is a leader in key segments of health care through its foundational businesses and is creating new sources of value by expanding into next generation care delivery and health services, with a goal of improving satisfaction levels for both providers and consumers. The Company believes its integrated health care model increases access to quality care, delivers better health outcomes and lowers overall health care costs.

132.    The 1Q 2023 10-Q also used similarly positive language when giving an overview

of CVS's Health Care Benefits segment, stating, in relevant part:

The Health Care Benefits segment operates as one of the nation's leading diversified health care benefits providers. The Health Care Benefits segment has the information and resources to help members, in consultation with their health care professionals, make more informed decisions about their health care. The Health Care Benefits segment offers a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, PDPs and Medicaid health care management services. The Health Care Benefits segment's customers include employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers ("providers"), governmental units, government-sponsored plans, labor groups and expatriates. The Company refers to insurance products (where it assumes all or a majority of the risk for medical and dental care costs) as "Insured" and administrative services contract products (where the plan sponsor assumes all or a majority of the risk for medical and dental care costs) as "ASC." In addition, effective January 2022, the Company entered the individual public health insurance exchanges ("Public Exchanges") in eight states through which it sells Insured plans directly to individual consumers. The Company entered Public Exchanges in four additional states effective January 2023.

133.    With respect to current trends, the 1Q 2023 10-Q stated, in relevant part:

We also face trends and uncertainties specific to our reportable segments, certain of which are summarized below and also discussed in the review of our segment results. For the remainder of the year, the Company believes you should consider the following important information:

- ***The Health Care Benefits segment is expected to continue to benefit from***

> ***Medicare and Commercial membership growth***, partially offset by
> declines in Medicaid due to the impact of redeterminations in 2023.

***May 3, 2023 Earnings Call***

134.     Later on May 3, 2023, the Company held an earnings conference call with
investors and analysts to discuss CVS's financial and operational results for the first quarter of the
2023 Fiscal Year (the "1Q 2023 Earnings Call"). During the call, Defendant Lynch announced:

> We are purposely executing on our strategy as we continue to expand our health
> platform of capabilities to serve a broader customer and consumer base. We are
> addressing the total cost of care, improving health, and expanding access to
> affordable quality care. ***Today we are announcing changes to our operating model
> and financial reporting that more accurately reflect how our businesses are
> managed***. These changes allow us to be more nimble in our execution and more
> innovative when expanding our products and services. We are excited about
> accelerating our momentum by unlocking long-term value across our businesses
> and the broader healthcare marketplace.

135.     The statements in paragraphs ¶¶128-134 above were materially false and/or
misleading and failed to disclose material adverse facts about the Company's business, operations,
and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused
the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1)
CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns
in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial
expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that
were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits
segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the
contrary, the Company's other segments did not generate sufficient revenues to offset the negative
impact of the increased expenditures within the Health Care Benefits segment; and (5) the
Company failed to maintain internal controls. As a result of the foregoing, the Company's public
statements were materially false and misleading and/or lacked a reasonable basis at all relevant

times.

## The Truth Begins To Emerge As The False And Misleading Statements Continue

### *August 2, 2023 Press Release*

136.    The truth began to emerge on August 2, 2023 when the Company published the 2Q

2023 Press Release, announcing CVS's financial and operational results for the second quarter of

the 2023 Fiscal Year. Among other disappointing disclosures, the 2Q 2023 Press Release

announced a decrease in CVS's diluted EPS guidance, lowering the range from between $6.90 to

$7.12 down to between $6.53 to $6.75.

### *August 2, 2023 10-Q*

137.    That same day, the Company filed with the SEC the 2Q 2023 10-Q. The 2Q 2023

10-Q was signed by Defendants Lynch and Guertin and included SOX certifications signed by

Defendants Lynch and Guertin attesting to its accuracy and attesting that "the information

contained in the [2Q 2023 10-Q] fairly presents, in all material respects, the financial condition

and results of operations of the Company."

138.    In explaining the negative guidance change, the 2Q 2023 10-Q revealed:

> *Operating income decreased $1.4 billion, or 30.7%, in the three months ended June 30, 2023 compared to the prior year primarily due to declines in the Health Care Benefits segment, including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year*, and the Pharmacy & Consumer Wellness segment, as well as a restructuring charge and acquisition-related transaction and integration costs recorded in the current year.

139.    On this news, the price of the Company's common stock fell $2.04 per share, or

approximately 2.7%, from a closing price of $74.36 per share on August 2, 2023, to a closing

price of $72.32 per share on August 3, 2023. However, despite these partial disclosures, the

Individual Defendants continued to obfuscate the truth about CVS's premium forecast accuracy

and issues predicting medical cost trends.

140.    For example, despite the negative news regarding the decrease in operating income, the 2Q 2023 10-Q remained positive, particularly in its discussion of current trends. The 2Q 2023 10-Q contained substantially the same representations as in ¶¶131-133, *supra*. The 2Q 2023 10-Q also stated the following, in relevant part:

> The Health Care Benefits segment is expected to experience higher than previously expected medical cost trend in Medicare Advantage for the remainder of 2023, while expected medical cost trends remain consistent with pricing in Commercial and Medicaid. ***The segment is expected to benefit from continued membership growth in Commercial, primarily related to the individual exchange business***.

***August 2, 2023 Earnings Call***

141.    Also on August 2, 2023, the Company held an earnings conference call with investors and analysts to discuss its financial and operational results for the second quarter of the 2023 Fiscal Year (the "2Q 2023 Earning Call"). During the call, Defendant Lynch discussed CVS's purported "performance highlights" for the quarter, stating:

> Turning to our performance highlights for the quarter, in our healthcare benefits segment, we grew revenues to $26.7 billion, an increase of nearly 18%, and delivered adjusted operating income of $1.5 billion. Medical membership in the second quarter was 25.6 million, an increase of 1.2 million members versus the prior year, reflecting broad-based growth including individual exchange, Medicare and commercial membership. For our core commercial membership, this quarter marks the eighth consecutive quarter of membership gains. This growth reflects our differentiated product offerings that address the total cost of care and the whole health of a member through our integrated solutions.

142.    Continuing on, Defendant Lynch addressed the trends in medical costs and utilization, stating:

> Medical cost trends were well controlled in our commercial and Medicaid books of business. Consistent with the broader industry, elevated medical costs emerged in our Medicare Advantage business which became apparent in the latter part of the quarter. The primary driver of these elevated medical costs was greater than expected utilization in outpatient settings.

143.    Defendant Lynch later discussed the impact that the performance of the Healthcare

Benefits segment had made on CVS's quarterly financial results, stating:

> ***This quarter, we were able to offset the pressures in our healthcare benefits segment with continued strong execution in our health services segment***. Revenues grew to $46.2 billion, an increase of nearly 8%. Adjusted operating income grew 3.5% to $1.9 billion. These results were driven by our pharmacy services business. ***We consistently demonstrate value to consumers and our clients by successfully managing drug cost trends and bringing innovative clinical solutions to the market.***

144.    Later on the call, Defendant Guertin addressed how the Healthcare Benefits segment was purportedly impacting the Company's guidance for the remainder of the 2023 Fiscal Year, stating:

> Turning now to our outlook for 2023, we are reaffirming our adjusted earnings per share guidance of $8.50 to $8.70. ***This guidance reflects our performance through the second quarter as well as a higher than expected Medicare Advantage medical cost trend for the remainder of 2023, offset by strength in our pharmacy services business within our health service segment***.

145.    The statements in ¶¶137, 140, and 141-144 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***November 1, 2023 Press Release***

146.    On November 1, 2023, the Company issued a press release revealing the Company's financial results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Press Release").

147.    The 3Q 2023 Press Release revealed another reduction in the Company's diluted EPS guidance range, down to between $6.37 to $6.61 from between $6.53 to $6.75.

***November 1, 2023 10-Q***

148.    That same day, the Company filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2023 (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendants Lynch and Cowhey and included SOX certifications signed by Defendants Lynch and Cowhey attesting to its accuracy and attesting that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." In addition, the 3Q 2023 10-Q contained substantively similar descriptions of CVS and its Health Care Benefits segment as discussed in ¶¶131-133, *supra*.

149.    The 3Q 2023 10-Q, like the 2Q 2023 10-Q, addressed the Company's operating income and the Health Care Benefits segment's impact, stating:

> Operating income increased $6.1 billion, or 141.4%, in the nine months ended September 30, 2023 compared to the prior year. The increase in operating income was primarily driven by the absence of $5.7 billion in opioid litigation charges recorded in the prior year and increases in the Pharmacy and Consumer Wellness segment, primarily driven by the absence of the $2.5 billion loss on assets held for sale recorded in the prior year related to the write-down of the LTC business which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to the prior year. ***These increases in operating income were partially offset by declines in the Health Care Benefits segment,*** including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year, as well as the restructuring charges and acquisition-related transaction and integration costs recorded in the current year.

150.    Despite these disclosures, CVS's stock continued to trade at artificially inflated prices as the Individual Defendants continued to obfuscate the true scope and gravity of the

ineffectiveness of CVS's forecasts and the resulting negative impact on the Company's financials.

***November 1, 2023 Earnings Call***

151.    On November 1, 2023, the Company held an earnings conference call with investors and analysts to discuss the Company's financial and operational results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Earnings Call"). On the 3Q 2023 Earnings Call, Defendant Lynch described the Company's strategy for the remainder of the 2023 Fiscal Year, stating:

> And once again, we generated outstanding operating cash flows, bringing our year-to-date total to $16.1 billion. We are reconfirming our guidance range for 2023 adjusted EPS of $8.50 to $8.70, ***this reflects execution against our strategy with strong performance in our Pharmacy & Consumer Wellness segment and continued momentum in our Health Services segment, offsetting incremental Medicare Advantage medical cost pressures in our Health Care Benefits segment***.
>
> Medicare Advantage is a key strategic growth area for our business. While it's still early in the 2024 annual enrollment period, we are confident that our competitive offering and attractive benefit design will meet consumer expectations. Aetna continues to be a leader in zero-dollar premium product and approximately 84% of Medicare eligibles will have access to Aetna plans in this category in 2024.

152.    In discussing the results specifically from the third quarter, Defendant Lynch revealed:

> Let's turn to our performance in the quarter. In our Health Care Benefits segment, we grew revenues to more than $26 billion, an increase of nearly 17% and delivered adjusted operating income of $1.5 billion. Medical membership in the third quarter grew to 25.7 million, an increase of 1.4 million members versus the prior year, reflecting growth across multiple product lines, including individual exchange, Medicare and commercial.
>
> We continue to experience elevated utilization trends in our Medicare Advantage business, primarily in outpatient and supplemental benefits such as dental, behavioral health, OTC and flex card. ***Given the elevated cost trends that have emerged this year, we are executing on plans to unlock additional revenue, clinical and network opportunities to help alleviate these pressures***.

153.    While discussing medical trends, Defendant Cowhey stated, in relevant part:

Our Medical Benefit ratio of 85.7% increased 230 basis points from the prior year quarter, primarily reflecting lower prior period development as well as higher Medicare Advantage utilization inside the quarter. Utilization pressure was primarily attributable to the categories Karen highlighted earlier, including outpatient and supplemental benefits such as dental, behavioral health, OTC and flex cards.

Further, we also experienced individual exchange growth in the special enrollment period that exceeded our expectations. These members, particularly when added late in the year, will drive a higher MBR. As a result, our higher individual exchange growth is also contributing to our updated MBR guidance for the full year. We continue to closely watch utilization trends in our other lines of business.

154.    Regardless of these trends and changes, Defendant Cowhey represented to investors that all of these changes and trends were expected, stating:

But at this stage, *we have not observed any other trends that we would consider inconsistent with our total expectations*. Days claims payable at the end of the quarter was 50.3, up 3.4 days sequentially and reserve growth exceeded premium growth sequentially. Overall, we remain confident in the adequacy of our reserves.

155.    The statements in ¶¶148 and 151-154 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*February 7, 2024 Press Release*

156.    On February 7, 2024, the Company issued a press release revealing the Company's financial results for the 2023 Fiscal Year (the "FY 2023 Press Release").

157.    The FY 2023 Press Release revealed that CVS was again revising the Company's diluted EPS guidance range, reducing it to at least $7.06, down from at least $7.26.

158.    The FY 2023 Press Release also announced that CVS was revising its adjusted EPS guidance range, going to at least $8.30 from at least $8.50.

159.    Further, the FY 2023 Press Release announced that the Company was reducing its cash flow from operations guidance, down to at least $12.0 billion from at least $12.5 billion.

*February 7, 2024 10-K*

160.    That same day, the Company filed with the SEC its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Lynch, Cowhey, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Millon, Mahoney, and Schapiro. The 2023 10-K also included SOX certifications signed by Defendants Lynch and Cowhey attesting to its accuracy and attesting that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." In addition, the 2023 10-K contained substantively similar descriptions of CVS and its Health Care Benefits segment as discussed in ¶¶131-133, *supra*.

161.    In discussing the Company's operating income, the 2023 10-K represented:

Operating income increased $5.8 billion, or 72.8%, in 2023 compared to 2022. The increase in operating income was primarily driven by the absence of $5.8 billion of opioid litigation charges recorded in 2022 and increases in the Pharmacy & Consumer Wellness segment, primarily driven by the absence of a $2.5 billion loss on assets held for sale recorded in 2022 related to the write-down of the Company's Omnicare® long-term care business ("LTC business") which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to 2022, as well as an increase in the

Health Services segment. *These increases in operating income were partially offset by declines in the Health Care Benefits segment, including the absence of the $250 million pre-tax gain on the sale of bswift and the $225 million pre-tax gain on the sale of PayFlex recorded in 2022*, as well as the restructuring charges and acquisition-related transaction and integration costs recorded in 2023.

***February 7, 2024 Earnings Call***

162.    On that same day, the Company held an earnings conference call with investors and analysts to announce the Company's financial outcomes for the 2023 Fiscal Year (the "FY 2023 Earnings Call"). Defendant Cowhey addressed the reduced guidance on the call, stating to investors that "we now expect adjusted operating income for the Healthcare Benefit segment to be at least $5.4 billion, *a decrease of $370 million from our prior estimates*."

163.    Later on the call, Defendant Lynch attempted to turn attention away from the Company's negative guidance, stating the following about the long-term outlook of the Company:

> *While the Medicare Advantage market has been challenged recently, our view of the long-term opportunity offered by this business remains unchanged.* As we discussed in December, we are committed to achieving our targeted 4% to 5% margin in Medicare Advantage over time and we will begin that journey in 2025. At CVS Health, we have both the scale to transform how healthcare is delivered, and the ability to personalize care and coverage for each individual we serve. By bringing together the powerful capabilities of our brands, including Aetna, CVS Pharmacy, CVS Health Buyer and Caremark, we can deliver significant value to the customers and communities we serve and unlock tremendous potential for our shareholders.
>
> ***
>
> I'll now turn to the highlights from each of our businesses in the quarter. In our healthcare benefits segment, *we continue to navigate through elevated utilization trends in our Medicare Advantage business*. In the quarter, we grew revenues to nearly $27 billion, an increase of over 16%, and delivered adjusted operating income of $676 million, medical membership ended the year at 25.7 million an increase of 1.3 million members versus the prior year reflecting growth across multiple product lines, including individual exchange, Medicare and commercial. Medicare Advantage is integral to the CVS Health Strategy, after a very successful 2024 annual enrollment period, we expect to add at least 800,000 new members in 2024.

164.    Despite the Individual Defendants best efforts to obscure the reality, on this news

the price of the Company's common stock fell $0.96 per share, or approximately 1.3%, from a closing price of $75.32 per share on February 7, 2024, to a closing price of $74.36 per share on February 8, 2024.

165.    The statements in ¶¶160 and 163 were materially false and misleading because they failed to disclose, *inter alia*, that:  (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times

### April 5, 2024 Proxy Statement

166.    On April 5, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

167.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3)

approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve an amendment to the 2017 ICP to increase the number of common shares available under the 2017 ICP by 33,500,000 (the "2024 Amendment to the 2017 ICP"). As disclosed in the 2024 Proxy Statement, as of December 31, 2023, there were 11,000,000 shares of common stock remaining which were available to be issued under the 2017 ICP, with an additional 16,700,000 available under the Signify Health, Inc. 2021 Long-Term Incentive Pan, as amended (the "Signify Health Plan") and the Oak Street Health, Inc. Omnibus Incentive Plan, as amended (the "Oak Street Health Plan" together with the Signify Health Plan, the "Acquired Company Plans").

168.    The 2024 Proxy Statement noted that if the CVS shareholders approved the 2024 Amendment to the 2017 ICP, it would "increase the number of shares of common stock authorized to be issued under the 2017 ICP by 33.5 million, in order to permit the Company to continue to grant awards under the 2017 ICP." Further, the 2024 Proxy Statement noted that approval of the 2024 Amendment to the 2017 ICP will "streamline the administration of incentive compensation and ensure equal treatment for all eligible employees, the MP&D Committee recommended and the Board approved the termination of both Acquired Company Plans."

169.    Regarding "The Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> The Board's role in risk oversight involves both the full Board and its committees, as well as members of management.
>
> **The Board's risk oversight function:**
> - The Board focuses on understanding Company-wide risks and ensuring that risk matters are appropriately brought to the Board and/or its committees for review.
>
> - The Board ensures that the Corporate Governance Guidelines, the Board's leadership structure and the Board's practices facilitate the effective oversight of risk and communication with management.

- The Board received regularly updates on specific risks in the course of its review of corporate strategy, business plans and reports to the Board by its respective committees.

The Board considers its role in risk oversight when evaluating the Company's Corporate Governance Guidelines and the Board's leadership structure. Both the Corporate Governance Guidelines and the Board's leadership structure facilitate the Board's oversight of risk and communication with management. Our Independent Chair and our CEO are focused on CVS Health's and the Board's risk management efforts and ensure that risk matters are appropriately brought to the Board and/or its committees for their review.

170. Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

CVS Health has adopted a Code of Conduct that applies to all of our directors, officers and employees, including our CEO, CFO and Chief Accounting Officer. Our Code of Conduct is available on our website at https://investors.cvshealth.com/investors/corporate-governance/documents/default.aspx and will be provided to stockholders without charge upon request to our Corporate Secretary. We intend to post amendments to, or waivers of, our Code of Conduct (to the extent applicable to our executive officers or directors) at that location on our website within the timeframe required by SEC rules.

171. Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; (5) the Individual Defendants were

improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2017 ICP; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

172.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

173.    As a result of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the 2024 Amendment to the 2017 ICP.

174.    As a result of the shareholders approving the 2024 Amendment to the 2017 ICP, there were an additional 33,500,000 shares available for issuance under the Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received

material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2017 ICP. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2017 ICP in the future.

## **THE TRUTH FULLY EMERGES**

### *May 1, 2024 Press Release*

175.     The truth fully emerged on May 1, 2024 when the Company issued the 1Q 2024 Press Release, revealing its financial outcomes for the first quarter of the 2024 Fiscal Year. The 1Q 2024 Press Release revealed disappointing guidance, with significant cuts to major indicators. In particular, the 1Q 2024 Press release revealed:

**2024 full-year guidance**

- Revised GAAP diluted EPS guidance to at least $5.64 from at least $7.06

- Revised Adjusted EPS guidance to at least $7.00 from at least $8.30

- Revised cash flow from operations guidance to at least $10.5 billion from at least $12.0 billion

176.     The 1Q 2024 Press Release also revealed underwhelming operating results and explained the revised guidance from the first quarter, stating:

> First quarter GAAP diluted EPS of $0.88 decreased from $1.65 in the prior year and Adjusted EPS of $1.31 decreased from $2.20 in the prior year, ***primarily due to a decline in the Health Care Benefits segment's operating results, reflecting utilization pressure in the Company's Medicare business***.

> Recognizing the potential for continued elevated medical cost trends in the remainder of 2024, the Company revised its full-year 2024 GAAP diluted EPS, Adjusted EPS and cash flow from operations guidance to reflect the assumption that the majority of this pressure will persist throughout 2024.

### *May 1, 2024 10-Q*

177.    That same day, the Company filed the 1Q 2024 10-Q with the SEC. The 1Q 2024

10-Q was signed by Defendants Lynch and Cowhey and included SOX certifications signed by

Defendants Lynch and Cowhey attesting to its accuracy.

178.    The 1Q 2024 10-Q revealed a severe decline in the Company's operating income,

announcing:

> Operating income decreased $1.2 billion, or 34.1%, in the three months ended
> March 31, 2024, ***primarily due to increased Medicare utilization, the unfavorable
> impact of the previously disclosed decline in the Company's 2024 Medicare
> Advantage star ratings and a year-over-year unfavorable impact from
> development of prior-years' health care cost estimates in the Health Care
> Benefits segment***, as well as continued pharmacy client price improvements, lower
> contributions from 340B and the previously announced loss of a large client in the
> Health Services segment. These decreases were partially offset by an increase in
> operating income in the Pharmacy & Consumer Wellness segment, including the
> absence of a $349 million loss on assets held for sale related to the write-down of
> the Company's Omnicare® long-term care business ("LTC business") recorded in
> the prior year.

179.    On this news, the price of the Company's common stock fell $11.40 per share, or

approximately 16.8%, from a closing price of $67.71 per share on April 30, 2024 to a closing price

of $56.31 per share on May 1, 2024.

## **REPURCHASES DURING THE RELEVANT PERIOD**

180.    During the Relevant Period, the Individual Defendants caused the Company to

initiate repurchases of its common stock that substantially damaged the Company. In total, the

Company spent an aggregate amount of ***over $3.0 billion*** to repurchase approximately 39,702,374

shares of its own common stock at artificially inflated prices between January 2024 and March

2024.

181.    According the 1Q 2024 10-Q, between January 1, 2024 and January 31, 2024, the

Company repurchased 31,408,970 shares of its own common stock at an average price per share

of approximately $80.38, for a total cost to the Company of approximately $2,524,653,008.60.

_

182.    As the Company's stock was actually worth only $56.31 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $756,013,907.90 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

183.    According to the 1Q 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 8,293,404 shares of its own common stock at an average price per share of approximately $57.33, for a total cost to the Company of approximately $475,460,851.32.

184.    As the Company's stock was actually worth only $56.31 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $8,459,272.08 for repurchases of its own stock between March 1, 2024 and March 31, 2024.

185.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***$764,473,179.98***.

## DAMAGES TO CVS

186.    As a direct and proximate result of the Individual Defendants' conduct, CVS will lose and expend many millions of dollars.

187.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; its EVP, CFO; and its former EVP, CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

188.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

189.    Such expenditures will also include costs incurred in any internal investigations

pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

190.    Such expenditures include the $764,473,179.98 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

191.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including payments made pursuant to the 2017 ICP as a result of shareholders approving the amendment discussed herein.

192.    As a direct and proximate result of the Individual Defendants' conduct, CVS has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

193.    Plaintiff brings this action derivatively and for the benefit of CVS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CVS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

194.    CVS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

195.    Plaintiff is, and has been at all relevant times, a shareholder of CVS. Plaintiff will

adequately and fairly represent the interests of CVS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, CVS's Board consisted of the following twelve individuals: Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the twelve Director-Defendants that were on the Board at the time this action was filed.

198.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by *over $764.4 million* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

199.    The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to CVS.

200.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Amendment to the 2017 ICP, which increased the amount of shares available under the Incentive Plan by 33,500,000. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Amendment to the 2017 ICP who would not have approved the 2024 Amendment to the 2017 ICP, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Amendment to the 2017 ICP at the annual meeting of stockholders of CVS on May 16, 2024, 11,000,000 shares remained available for future issuance under the 2017 ICP, and 16,700,000 aggregate shares available under the Acquired Company Plans. After the shareholders approved the 2024 Amendment to the 2017 ICP, there were an additional 33,500,000 shares available for issuance under the amended 2017 ICP. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the 2017 ICP that increased the number of shares available under the 2017 ICP. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

201.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted CVS to issue materially false and misleading statements. Specifically, the Director-Defendants caused CVS to issue false and misleading statements which were intended to obscure the ineffectiveness of CVS's medical trend forecasts.

Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

202.    Additional reasons that demand on Defendant Lynch is futile to follow. Defendant Lynch has served as the CEO and a director of the Company since February 2021. The Company provides Defendant Lynch with her principal occupation, for which she receives handsome compensation for her role at the Company. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Amendment to the 2017 ICP. As the trusted CEO, Defendant Lynch conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. She is also a defendant in the Securities Class Action. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Lynch is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP.  For these reasons, too, Defendant Lynch faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Aguirre is futile to follow. Defendant Aguirre has served as a Company director since November 2018. He also serves as the Chair of the Audit Committee and a member of the Management Planning and Development Committee. Defendant Aguirre received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Aguirre solicited the 2024 Proxy Statement, which led to the reelection of Defendants Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Aguirre is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Aguirre breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Balser is futile follow. Defendant Balser has served as a Company director since September 2022. He also serves as a member of the Health Services and Technology Committee, the Audit Committee, and the Executive Committee. Defendant Balser has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Balser solicited the 2024 Proxy Statement, which led to

the reelection of Defendants Aguirre, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Balser is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Balser breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205. Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since March 2007. He also serves as the Chair of the Management Planning and Development Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Brown has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Brown solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make

66

false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Brown is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.     Additional reasons that demand on Defendant DeCoudreaux is futile follow. Defendant DeCoudreaux has served as a Company director since March 2015. She also serves as a member of the Health Services and Technology Committee and the Nominating and Corporate Governance Committee. Defendant DeCoudreaux has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant DeCoudreaux solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeParle, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant DeCoudreaux is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to

receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant DeCoudreaux breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant DeParle is futile to follow. Defendant DeParle has served as a Company director since September 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Health Services and Technology Committee. In addition, Defendant DeParle solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, Farah, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant DeParle is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant DeParle breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Farah is futile follow. Defendant Farah has served as a Company director since November 2018, and has served as Independent Chair of the Board since May 2022. He also serves as the Chair of the Executive Committee and as a member of the Management Planning and Development Committee and the Nominating and Corporate Governance Committee. Defendant Farah has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Farah solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Finucane, Kirby, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director and Independent Chair of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Farah is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Farah breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Finucane is futile follow. Defendant Finucane has served as a Company director since January 2011. She also serves as a member of the Audit Committee and the Management Planning and Development Committee. Defendant

Finucane has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Finucane solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Kirby, Lynch, Mahoney, Millon, and Schapiro, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Finucane is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Finucane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Kirby is futile follow. Defendant Kirby has served as a Company director since October 2023. He also serves as a member of the Health Services and Technology Committee. Defendant Kirby has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Kirby solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Mahoney, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company

director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Kirby is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Kirby breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as a Company director since November 2023. He also serves as a member of the Management Planning and Development Committee and the Executive Committee. Defendant Mahoney has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Mahoney solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Millon, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Mahoney is eligible to receive stock awards under the 2024 Amendment to

the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Mahoney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Millon is futile follow. Defendant Millon has served as a Company director since March 2007. He also serves as the Chair of the Health Services and Technology Committee and as a member of the Audit Committee. Defendant Millon has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Millon solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Mahoney, and Schapiro, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Millon is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Millon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Schapiro is futile follow. Defendant Schapiro has served as a Company director since May 2017. She also serves as a member of the Audit Committee and the Health Services and Technology Committee. Defendant Schapiro has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Schapiro solicited the 2024 Proxy Statement, which led to the reelection of Defendants Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Lynch, Kirby, Mahoney, and Millon, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2024 Amendment to the 2017 ICP. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Amendment to the 2017 ICP, Defendant Schapiro is eligible to receive stock awards under the 2024 Amendment to the 2017 ICP, and has the opportunity to receive material amounts of stock awards under the 2024 Amendment to the 2017 ICP in the future, thereby materially benefiting from the adoption of the 2024 Amendment to the 2017 ICP. For these reasons, too, Defendant Schapiro breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    Additional reasons that demand on the Board is futile follow.

215.    Defendant Aguirre, Balser, Finucane, Millon and Schapiro (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with

applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

216.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

217.    CVS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for CVS any part of the damages CVS suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

218.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

219.     The acts complained of herein constitute violations of fiduciary duties owed by CVS's officers and directors, and these acts are incapable of ratification.

220.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CVS. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of CVS, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

221.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause CVS to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

222.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

225.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

226.    Under the direction and watch of Defendants Lynch, Aguirre, Balser, Brown,

DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

227.    The 2024 Proxy Statement also failed to disclose that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2017 ICP; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

228.    In exercise of reasonable care, Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Ludwig, Mahoney, Millon, and Schapiro should have known that by misrepresenting or failing to disclose the foregoing material facts, the

statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board and the approval of the 2024 Amendment to the 2017 ICP.

229.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Lynch, Aguirre, Balser, Brown, DeCoudreaux, DeParle, Farah, Finucane, Kirby, Mahoney, Millon, and Schapiro to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Amendment to the 2017 ICP.

230.    The Company was damaged as a result of Defendants Lynch's, Aguirre's, Balser's, Brown's, DeCoudreaux's, DeParle's, Farah's, Finucane's, Kirby's, Ludwig's, Mahoney's, Millon's, and Schapiro's material misrepresentations and omissions in the 2024 Proxy Statement.

231.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

### SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    The Individual Defendants, by virtue of their positions with CVS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CVS and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence

and exercised the same to cause CVS to engage in the illegal conduct and practices complained herein.

**234.**    Plaintiff, on behalf of CVS, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding CVS. Not only is CVS now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon CVS by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *39,702,374* of its own shares at artificially inflated prices, damaging CVS.

237.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

238.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in

79

order to make the statements made about CVS not misleading.

239.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

240.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

241.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

242.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CVS's business and affairs.

243.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

244.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CVS.

245.    In breach of their fiduciary duties owed to CVS, the Individual Defendants

willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) CVS's forecasts used to set plan premiums failed to account for trends in medical costs and patterns in health care utilization; (2) due to the foregoing, the Company was likely to incur substantial expenses in order to cover cost increases that CVS's forecasts did not account for (and thus, that were not covered by plan premiums); (3) as such, the profitability of CVS's Health Care Benefits segment was overstated by Defendants; (4) despite the Individual Defendants' claims to the contrary, the Company's other segments did not generate sufficient revenues to offset the negative impact of the increased expenditures within the Health Care Benefits segment; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the 2017 ICP; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

246.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

247.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

248.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

249.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

250.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CVS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

253.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

254.    By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CVS.

255.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from CVS that was tied to the performance or artificially inflated valuation of CVS, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

256.    Plaintiff, as a shareholder and representative of CVS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

257.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

258.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

259.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CVS, for which they are legally responsible.

260.    As a direct and proximate result of the Individual Defendants' abuse of control, CVS has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

262.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

263.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CVS in a manner consistent with the operations of a publicly held corporation.

264.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CVS has sustained and will continue to sustain significant damages.

265.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

266.     Plaintiff, on behalf of CVS, has no adequate remedy at law.

### EIGHTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

267.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

269.     In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

270.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

271.     Plaintiff, on behalf of CVS, has no adequate remedy at law.

## NINTH CLAIM
**Against Defendants Lynch, Guertin, and Cowhey for Contribution Under Sections 10(b) and 21D of the Exchange Act**

272.	Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

273.	CVS and Defendants Lynch, Guertin, and Cowhey are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lynch's, Guertin's, and Cowhey's willful and/or reckless violations of their obligations as officers, directors, and/or former officers CVS.

274.	Defendants Lynch, Guertin, and Cowhey, because of their positions of control and authority as officers, directors, and/or former officers of CVS, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of CVS, including the wrongful acts complained of herein and in the Securities Class Action.

275.	Accordingly, Defendants Lynch, Guertin, and Cowhey are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

276.	As such, CVS is entitled to receive all appropriate contribution or indemnification from Defendants Lynch, Guertin, and Cowhey.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of CVS, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CVS;

(c)    Determining and awarding to CVS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing CVS and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CVS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of CVS to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding CVS restitution from the Individual Defendants, and each of

them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 30, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
John Coyle
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
      shashmi@thebrownlawfirm.net
      edonohoe@thebrownlawfirm.net
      jcoyle@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Chaya Sara Kaufmann, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 ___ day of August, 2024.

Signed by:

Chaya Sara Kaufmann